# UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY



MARTIN LUTHER KING JR. FEDERAL BLDG. & U.S. COURTHOUSE
50 WALNUT STREET, P.O. BOX 419
NEWARK, NJ 07101-0419
(973) 645-6340

WILLIAM J. MARTINI
    JUDGE

December 1, 2006

## LETTER OPINION

**VIA REGULAR MAIL**

R. Joseph Gribko
U.S. Attorney's Office
970 Broad Street
Newark, NJ 07102
    (*Attorney for Plaintiff*)

Robert G. Stahl
Stahl, Farella & Sarokin, LLC
220 St. Paul St.
Westfield, NJ 07090
    (*Attorney for Defendant*)

      **RE:**   **United States v. Al-Yamin Clark**
            **Crim. No. 06-376 (WJM)**

Dear Counsel:

     This matter comes before the Court on Defendant Al-Yamin Clark's motion to suppress. The Court heard testimony in this matter on October 27, 2006 from Officer Frank Sebasco; Officer Kevin McDonough; Hasonna Bell; and Desiree Clark, and on November 6, 2006 from the Defendant, Al-Yamin Clark. Oral argument was also heard on November 6, at which time the matter was taken under advisement. Now, for the reasons set forth below, the Defendant's motion is **denied**.

I.  **THE STOP & SEARCH OF THE TAHOE**

**Background**

The Defendant first moves to suppress the evidence recovered from his vehicle. Although the witnesses' accounts of the search differed in some respects, the essential facts are not in dispute.

Officers McDonough and Sebasco are experienced narcotics detectives with the Elizabeth Police Department in New Jersey. The officers were in the area of 7th and Fulton Streets in Elizabeth on the evening of December 22, 2004, to serve as a backup perimeter unit covering an undercover drug purchase by a DEA agent.

The testimony differs as to exactly where the defendant stopped his vehicle and what the precise lighting conditions were in the area. Significantly, however, the Defendant's account of what happened that evening closely matches the officers' accounts of what they observed.

The officers testified that from where they were parked, they observed a black Chevrolet Tahoe with tinted windows pull up and park along the curb on 7th Street around 5:15 pm. Although it was dark outside, they were able to see an individual inside the Tahoe dialing a cell phone, because the cell phone keypad illuminated the interior of the vehicle. Several minutes after the officers first noticed the Tahoe, a black Ford Explorer with tinted windows pulled up behind the Tahoe. The driver of the Tahoe then exited the vehicle, and was immediately recognized by Officer McDonough as the Defendant. The Defendant was known to Officer McDonough as a mid-level drug trafficker in Elizabeth.

The Defendant walked to the passenger side of the Explorer and got in. Aside from the Defendant, there appeared to be just one person in the Explorer, the male driver. After a couple of minutes, the Defendant exited the passenger's side of the Explorer carrying a bag that the officers had not seen when the Defendant entered the Explorer. The bag was a semi-transparent tan grocery bag, and was wrapped tightly around its contents, which were of a rectangular shape. The officers testified that they could observe reddish or brown coloring through the bag where it was pulled tightly around the bag's squared-off corners.

Although this series of events took place after dark, the officers were able to make these observations of the defendant's activity because the area was well-lit by streetlights and because the Defendant walked in front of the Explorer's lit headlights with the bag. The Defendant re-entered the Tahoe through the driver's side door, and both the Tahoe and the Explorer drove off.

Based on their extensive experience with drug transactions, the officers believed they had witnessed a drug transaction between the defendant and the occupant of the Explorer. The officers testified that the activity they observed was consistent with how drug transactions are

often conducted on the street, and that the package carried by the defendant was consistent in size, shape and color with the way that heroin is packaged and distributed.

The officers radioed to the DEA that they were abandoning their surveillance of the undercover buy. They called for backup and started to follow the Tahoe, which they believed was more likely than the Explorer to yield evidence of the drug transaction after observing Mr. Clark carry what appeared to be bricks of heroin into the Tahoe. The officers followed the Tahoe to a lot at 600 Fulton Street, where it parked. The officers then exited their car and approached the Tahoe on foot. Officer McDonough approached the driver's side and Detective Sebasco approached the passenger's side. Officer McDonough testified that upon observing the officers, the defendant appeared to be confused or in a state of panic. The defendant was making "furtive movements" and patting himself down. Officer McDonough testified that it was not until after seeing the Defendant in this panicked state that he determined to remove the Defendant from the vehicle before talking with him further. Ultimately, the Defendant addressed Officer McDonough by his first name, Kevin, and said he was coming out of the vehicle. The Defendant reached out the window and opened the door, and was then placed on the ground and handcuffed by Officer McDonough.

Officer Sebasco testified that as he stood at the passenger side of the vehicle, he observed the tan bag in the defendant's lap, and saw it fall to the floor of the driver's side of the vehicle when the defendant got out of the car. Entering the passenger side of the vehicle to take a closer look at the bag, which was in plain view on the floor of the driver's side, Officer Sebasco testified that he was able to see through the knot at the top of the bag that the package was wrapped in magazine paper in a manner consistent with the typical packaging of heroin.

The Defendant's testimony corroborated the officers' in most respects, with a few differences. First, the Defendant testified that the drug transaction took place on 7th Street near East Jersey Street, which is approximately a block away from the corner of 7th and Fulton. The officers testified that they were parked on Fulton Street near the corner of 7th. The Defendant argues that if the officers had indeed been parked on that corner, he would have seen them. Because the officers' testimony about what they observed strongly correlated in almost every respect with how the Defendant said the drug transaction unfolded, it is clear to the Court that the officers were able to observe the Defendant's activities from where they were parked. No other explanation was offered to account for the officers' knowledge of the details of the transaction. Therefore, the precise location of the vehicles is immaterial. Even if the transaction did take place at 7th and East Jersey with the officers parked on Fulton near 7th, that vantage point would arguably have given the officers a *better* view of the bag in the Defendant's hand as he walked back to the Tahoe. Furthermore, the Court finds it more plausible that a drug deal on a public street at around 5:15 pm on a weekday would take place in front of an open park at 7th and Fulton than closer to a pharmacy and across from an office building at 7th and East Jersey.

Second, the Defendant testified that as he walked from the Explorer back to the Tahoe, the package of heroin was palmed within his hand in such a manner that it would have been

impossible for the officers to observe the shape or color of the package.  The Court had the opportunity to observe the bag itself, introduced as Exhibit 10B, and the quantity of heroin it contained, introduced as Exhibit 10A.  The Court also observed the Defendant's in-court demonstration of how he carried the bag, which convinced the Court that the shape of the bag would have been obviously discernible to the officers and not obscured by the Defendant's hand.  Taking all this into consideration, the Court finds the officers' testimony that they were able to observe the size, shape and color of the bag as Defendant walked with it in his hand to be credible.

Finally, the Defendant testified that the bag of heroin was not in plain view inside the vehicle, but was inside a closed compartment in the center console, and that he did not make furtive movements or pat himself down upon approach by the officers, but merely reached for his seat belt.  As the Court will explain, crediting the Defendant's testimony on these two issues would not change the outcome on this motion to suppress.  The Defendant also testified that he did not dial a cell phone inside the Tahoe.  The Court finds the officers' testimony credible on this point as well, but finds that even if the Defendant did not make a cell phone call from the Tahoe, the totality of the other circumstances observed by and known to the officers still overwhelmingly supported their conclusion that a drug transaction was taking place.

The Defendant argues that he was being targeted by Officer McDonough, and that this casts doubt on the credibility of the officers' accounts of their observations on the evening in question and their stated reasons for being in the area.  In support of this argument, Defendant offered the testimony of Hasonna Bell, who said that in the fall of 2004 Officer McDonough had offered her leniency on a drug charge if she would help him incriminate the Defendant.  As already discussed, however, the Court finds no reason to discredit the officers' testimony as to why they were in the area that evening or what precisely they were able to observe.

## Discussion

Under the precedent of the Third Circuit and the United States Supreme Court, an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop — known as a *Terry* stop — when the officer has a reasonable, articulable suspicion that criminal activity is afoot.  *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006).  "Reasonable, articulable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *Delfin-Colina*, 464 F.3d at 396.  For such a stop, only a "minimal level of objective justification" is necessary.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Delfin-Colina*, 464 F.3d at 396.  In evaluating whether the officers had an objective basis for reasonable suspicion, the totality of the circumstances must be taken into account.  *Sokolow*, 490 U.S. at 8; *Delfin-Colina*, 464 F.3d at 397.

Under the circumstances presented in this case, the officers were certainly justified in approaching Mr. Clark in order to conduct a brief, investigatory stop pursuant to *Terry*.  The

officers had personally observed a known narcotics trafficker engaging in what appeared, based on their extensive experience, to be a drug transaction. Furthermore, the officers saw the Defendant carry the fruits of that transaction — a bag consistent with the street packaging of heroin — into his vehicle and drive away. These circumstances clearly add up to a "reasonable, articulable suspicion" that Mr. Clark was engaged in criminal activity. *See United States v. Brown*, 448 F.3d 239, 246-47 (3d Cir. 2006) (describing the precepts governing the "reasonable suspicion" inquiry). Even if Mr. Clark did not make a cell phone call from the Tahoe, the totality of the other circumstances observed by and known to the officers still overwhelmingly supported their conclusion that a drug transaction was taking place. The officers here clearly had the minimal level of objective justification necessary to stop Mr. Clark for follow-up investigatory inquiry.

Whether the Defendant engaged in "furtive movements" or was merely reaching for his seat belt when the officers approached the vehicle is not particularly relevant. It is undisputed that the Defendant made some movement with his hands, which under the circumstances could reasonably be interpreted as presenting a threat to the officers. As the Court has discussed, the officers already had reasonable suspicion to conduct a *Terry* stop, based on their prior observations. The Defendant's movements upon the officers' approach merely provided further justification for ordering Defendant to exit the vehicle and for searching the Tahoe.

Furthermore, even before the officers approached the Tahoe and observed the Defendant's movements, and independently of the justification for a *Terry* stop of the Defendant, this Court would find that the officers had probable cause to search the Tahoe for the bag based solely on the circumstances known to and observed by the officers to that point.

The automobile exception to the warrant requirement permits law enforcement officers to seize and search an automobile without warrant if probable cause exists to believe it contains contraband. *See Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999); *United States v. Burton*, 288 F.3d 91, 100-01 (3d Cir. 2002). While probable cause requires more than mere suspicion, it does not require that the officers have evidence sufficient to prove guilt beyond a reasonable doubt. *Burton*, 288 F.3d at 98.

The Third Circuit in *Burton* recognized that probable cause can exist "even in the absence of the actual observance of criminal conduct when a prudent observant would reasonably infer that a defendant acted illegally." *Id*. The Court finds the analysis in *Burton* to be applicable here. In *Burton*, where officers observed the defendant engaging in what they reasonably believed to be a drug deal and placing the results of that transaction in the trunk of his car, the Third Circuit found that probable cause existed to conclude that the car contained contraband and that the officers therefore had probable cause to search the car immediately. *See id*. at 100-01.

Here, as in *Burton*, "[t]he significant accumulation of evidence supporting a drug transaction justified a reasonable inference that a felony was being committed." *See id*. at 99. Furthermore, because Officers Sebasco and McDonough observed the Defendant, a known drug

dealer, participating in an apparent drug deal and carrying what appeared to be heroin into his vehicle, the officers had probable cause to conclude that the car itself was involved in illegality and contained contraband.

If, as Officer Sebasco testified, the bag was immediately visible inside the passenger compartment and its contents were obviously consistent with the packaging of heroin, then the plain view exception would obviate any need for a search warrant. *See United States v. Cicero*, 99 Fed. Appx. 361, 363 (3d Cir. 2004). The Court finds no reason to discredit Officer Sebasco's testimony on this point. But even if the Court were to credit Defendant's testimony that the bag was hidden from view in the center console, the officers had all the information they needed in order to search for the bag inside the Tahoe, including inside the console. *See Burton*, 288 F.3d at 100-01.

Because the officers had probable cause to search the Tahoe for the bag, regardless of whether the bag was in plain view or was hidden inside the center console, the Defendant's motion to suppress the evidence recovered from the Tahoe must be denied.

## II.  THE APARTMENT SEARCH

### Background

The Defendant also moves to suppress the approximately $18,000 in cash that was recovered from a dresser and a pile of clothes in the apartment of Desiree Clark, Apartment 307A at 600 Fulton Street. At the hearing before this Court on November 6, the government conceded that the Defendant has standing to challenge the search of Ms. Clark's apartment, where he stayed from time to time, kept some belongings and received mail, and to which he had his own set of keys. The only remaining issue, then, is whether Ms. Clark voluntarily consented to the search of her apartment.

After arresting the Defendant and leaving him behind with fellow officers, Officers McDonough and Sebasco entered the apartment building at 600 Fulton and were knocking on the door of Ms. Clark's apartment when she appeared in the hallway. From there, the witnesses' accounts diverge in several respects.

According to the officers, they identified themselves and explained that the Defendant had been arrested. Ms. Clark expressed embarrassment about having to talk with the officers in the hallway, so at Officer McDonough's suggestion she invited them into her apartment. The officers had no knowledge of where Ms. Clark was employed. Officer McDonough explained to Ms. Clark that the officers wanted to search the apartment to look for drugs or weapons, and told her that she was not involved and that she had a right to refuse the search. Ms. Clark gave her consent. After giving consent but before the search began, Ms. Clark grew nervous, and asked to speak with the Defendant. She was given an opportunity to do so on Officer McDonough's

Nextel radio, on the loudspeaker. In essence, Ms. Clark told the Defendant that the officers were in the apartment and wanted to search, and the Defendant told Ms. Clark that there was nothing in the apartment and she had nothing to worry about. Ms. Clark then pointed the officers to the main bedroom, where the Defendant spent time and kept belongings. The officers searched only that bedroom. They found over $15,000 in a pile of clothes and $2,500 in a dresser drawer. Officer McDonough described Ms. Clark as extremely cooperative.

Ms. Clark testified that when the officers told her the Defendant had been arrested, she started to cry. She then went into her apartment, and the officers followed her in without permission. Officer McDonough explained that he wanted to search the apartment and asked for her consent, and Ms. Clark said no. Officer McDonough told Ms. Clark that if she did not consent to the search, she would lose her job with the Union County Department of Corrections, and the officers would come back with a search warrant and tear the apartment to pieces. Ms. Clark testified that she still refused consent, but that the officers had begun looking around the apartment, inside canisters in the kitchen and inside bags of Christmas presents. Ms. Clark asked to speak with the Defendant and was given the opportunity via Officer McDonough's phone. Over the phone, the Defendant heard her crying and told her there was nothing in the house and she had nothing to worry about. Ms. Clark claims that she still did not consent, but the officers nevertheless continued to search the apartment. Officer Sebasco looked in her son's room and then joined Officer McDonough in searching the master bedroom, where they found the cash. Ms. Clark testified that she did not know anything about the $15,000 but that the $2,500 was hers, and was earmarked for car insurance and Christmas presents. She said that the officers did not tear the apartment up in the course of their search.

The Defendant also testified regarding the content of his phone conversation with Ms. Clark. His account corroborates the testimony of Ms. Clark and the officers.

## Discussion

A search conducted pursuant to voluntary consent falls within one of the specifically established exceptions to the warrant requirement. *United States v. Wilson*, 413 F.3d 382, 388 (3d Cir. 2005). In determining whether consent to search was freely and voluntarily given, the totality of the circumstances surrounding the consent must be examined. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *Wilson*, 413 F.3d at 388. The burden is on the government to prove that consent was, in fact, freely and voluntarily given. *United States v. Salehi*, 187 Fed. Appx. 157, 164 (3d Cir. 2006).

Having evaluated the credibility of the various witnesses and the conflicting testimony on the circumstances of the search, the Court is satisfied that the government has met its burden of proving that Ms. Clark did freely and voluntarily consent to the search of her apartment. The Court finds the officers' testimony on the circumstances of Ms. Clark's consent to be credible. Moreover, no evidence was presented to suggest that Ms. Clark's age, intelligence or educational background could have impacted the voluntariness of her consent. *See Wilson*, 413 F.3d at 388.

Ms. Clark testified that the officers told her that if she refused consent, she could lose her job and have her apartment torn apart — threats which, if indeed they were made, could bear on the voluntariness of her consent.  *See Schneckloth,* 412 U.S. at 228-29.  However, the defense does not argue that Ms. Clark consented under duress or coercion; indeed, because Ms. Clark claims that she never consented to the search despite the officers' alleged threats, it is unclear why duress would be relevant.

In the Court's view, Ms. Clark's insistence that she refused consent to the search is not credible.  It is undisputed that Ms. Clark spoke with the Defendant while the officers were in her apartment, and that the Defendant assured her that there was nothing in the apartment and that she should not worry.  The Court finds it highly implausible that Ms. Clark would have denied consent after receiving such assurances.  Furthermore, the narrow and orderly nature of the search — which was restricted to areas identified by Ms. Clark as likely to contain the Defendant's belongings, and which did not make a mess of the apartment — is wholly consistent with the Court's finding that Ms. Clark gave her consent, believing there was nothing incriminating to be found in the apartment.

In sum, the Court finds that the search of Ms. Clark's apartment was proper under the consent exception to the warrant requirement.  Therefore, the Defendant's motion to suppress the evidence recovered from the apartment must be denied.

### III.  STATEMENTS BY MS. CLARK AND THE DEFENDANT

Finally, the Defendant moves to suppress any statements made by himself and Ms. Clark as fruits of the illegal searches of the Tahoe and the apartment.  Because the Court has found that both searches were conducted properly within the law, this portion of Defendant's motion must also be denied.

### IV.  CONCLUSION

For the foregoing reasons, Defendant Al-Yamin Clark's motion to suppress is **DENIED.**  An appropriate Order accompanies this Opinion.

s/William J. Martini

**William J. Martini, U.S.D.J.**